**FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal No. 01-10255-WGY |
| ) | |
| RONALD ZAMPANTI ) | |
| Defendant ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Ronald Zampanti, age 35, has pled guilty to an information charging two counts: Count One, Operating an Illegal Gambling Business (18 U.S.C. § 1955), Count Two, Money Laundering Conspiracy (18 U.S.C. § 1956(h)). The Information also contains a Criminal Forfeiture Allegation (18 U.S.C. § 982) for $95,500.00, of which $50,500.00 was previously seized by the Massachusetts State Police.

The Probation Office has determined that the Adjusted Total Offense Level is 13, (¶77), resulting in a 12-18 month advisory sentence. The defendant has no objection to Probation's calculations of the Advisory Sentencing Guidelines. Pursuant to *United States v Booker,* No 040104, 2005 WL 50105 (U.S. Jan.12, 2005), in addition to considering the Advisory guideline calculation, the sentencing court is also mandated to consider Sentencing Factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant. Defendant submits the following information about his personal history and characteristics and the nature of the offense as a backdrop for the sentence recommendation below.

1

**History and Characteristics of the Defendant**

Ronald Zampanti's biological father died when he was an infant. Five years later, his mother married Joseph Zampanti, Jr., (co-defendant) who adopted Ronald and raised Ronald as his own son. Ronald attended Winthrop (MA) High School where he did well both academically and in high school sports; he then attended Merrimack College in North Andover (MA), graduating in 1993 with a solid academic record. Although Ronald's parents separated when he 24 years old, he remains loyal and on good terms with both parents. About 1995, Ronald and his future wife started a nail salon and tanning parlor business in East Boston. They married in 1997 and had two children, Ronald, age 9 and Lexa, age 5. Although the couple are devoted and care for each other, the pressures of the instant offense resulted in the couple's divorce in 2000. Mrs. Zampanti left the Winthrop home and moved with the children to Cape Cod in an effort to remove herself and the children from the ensuing publicity caused by the instant offense. Ronald bought out his ex-wife's portion of their business and he remains its sole owner.

Ronald Zampanti admits that his marriage broke up in large part because of his gambling activities, and since March 2001 he has put that life behind him and moved on. Through it all, moreover, he continued to maintain an amicable relationship with his ex-wife, with whom he shares joint custody of their two children, she with physical custody. He has been a devoted father, making the two-hour drive at least once a week to be with his children in Falmouth (MA) where they reside with their mother. The former Mrs. Zampanti writes of the defendant,

"He's an active participant in raising our children. Not only does he take the children on scheduled weekends, he drives to the Cape where the children and I reside to attend hockey practice, football practice, gymnastics, games and performances. ..He also attends school functions and is familiar with the teachers and staff at our children's school. He understands how difficult it is for me working full time and raising the children...he picks up the ball and helps with homework over the phone and talks to the kids about their day...He is my main financial source. He keeps our family going and

2

helps me with extra expenses when he can. He provides the kids with the necessities. I would not be able to survive without his financial support." *Letter attached as "A".*

It is Ronald's fondest hope to move to the Cape after disposition in this case so that he may be closer to his children and more fully participate in their lives.

Ronald has also always been extremely close to his mother, whose marriage with Joseph Zampanti broke up in the early 1990s. She became especially dependent on Ronald since developing breast cancer in 2004. She writes, "Every day for nine grueling months Ronnie was there for me, taking me back and forth to chemotherapy and radiation treatments." Meanwhile his grandmother also developed cancer and his aunt states that "my nephew was there daily to help me and my sister take care of his grandmother" until her death in November 2004. See Mrs. Zampanti's letter attached as "B". As several relatives attest, family comes first with Ronald and his concern now is to spare his children from any further penalties from his own misconduct. See Additional Letters attached as "C".

## Nature and Circumstances of the Offense

Ronald's father and co-defendant, Joseph Zampanti, (disposition pending before Judge Gorton) has admitted to being engaged in bookmaking since about 1980 or 1981 and by the time he was in high school Ronald has said he was well aware of his father's activities. The defendant in no way wishes to mitigate his actions by explaining the manner in which he became involved in the gambling business, nor does he place any blame on his father, but he believes he owes the court an explanation for his motivations. While the defendant was in college, his father was at one point committed to MCI-Concord which placed a financial hardship on his family. The father put Ronald in touch with a fellow bookmaker who would help him earn some extra money

3

to allow him to stay in school. (Ronald worked during his college years but could not earn enough to cover all his expenses.)

Later, Joe Zampanti formed a bookmaking operation with Carmine D'Amelio, (co-defendant sentenced 4/5/2005 before Judge Woodlock to Time Served, 12 months home detention.) Ronald accepts responsibility for joining the business, first as a clerk and then as an active solicitor of bets. He admits that by about 1998 he was a manager-partner in the operation but he points out that he neither started nor organized it. It was simply a business in which he gradually allowed himself to become enmeshed.

The defendant also wishes to point out, that unlike many bookmakers, he was not an addicted gambler. Zampanti admits he placed bets and became quite good at handicapping, but it was never a problem for him and he has not gambled for several years, nor does he miss it.

### Meeting the Purposes of this Sentence

As Ronald Zampanti stands now before the Court, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C.§3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct. (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Noteworthy is the manner in which the Sentencing Commission incorporated the purposes of (A), (B), and (C) into the Guidelines:

4

> A defendant's record of past criminal conduct is directly relevant to those purposes [§ 3553(a)]. A defendant with a record of prior criminal behavior is more culpable than a first offender and thus deserving of greater punishment. General deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence. To protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered. Repeated criminal behavior is an indicator of a limited likelihood of successful rehabilitation. *USSG Ch.3,Pt.A, intro.comment.*

The Commission acknowledged that it had made no definitive judgment as to the reliability of then existing data and promised to review additional data insofar as they became available. *Id.*

To that end, the Commission conducted a study released in May 2004: <u>Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines.</u>[1] "Using data collected from the guideline federal offenders sentenced in fiscal year 1992, the current study examines in detail the predictive statistical power of the criminal history measure..." *Recidivism study pg 2.*

Among other issues, the report concludes that offenders in CHC I have a substantially lower risk of recidivating within two years (13.8%) than do offenders in CHC VI (55.2%). *Id* pg 6. In general, as the number of criminal history points increase, the risk of recidivating within two years increases. *Id* pg 8. Zampanti has but one criminal history point that places him CHC I. In reviewing the defendant's conviction,*(PSR ¶36)* it is noteworthy that the defendant at that time was 20 years old and the offense involved the defendant's drinking. A later OUI at age 23 was discharged. Since those events, the defendant has had no further incidents involving alcohol and he does not manifest a drinking problem. The events are aberrational to the defendant's

---

[1]This study is available online at the Commission's website, www.ussc.gov/publications/research.

present state of mind and body. The fact that these events occurred more than 12 years ago without further incident is probative of Mr. Zampanti's ability to learn from past mistakes.

Another gauge to consider is the fact that recidivism rates decline relatively consistently as age increases. Among all offenders under age 21, the recidivism rate is 35.5%, while offenders over age 50 have a recidivism rate of 9.5% *Id* pg.12. Other factors that bode well for the defendant's very low risk to recidivate are listed in the study at pg 12 and include Employment Status, Educational Attainment, and Marital Status.. Data show that those with stable employment in the year prior to their instant offense are less likely to recidivate (19.6%) than are those who are unemployed (32.4%). Probation has verified Zampanti's longstanding employment.

As for Educational Attainment, overall, offenders with less than high school education are most likely to recidivate (31.4%), followed by offenders with a high school education (19.3%), offenders with some college education (18.0%), and offenders with college degrees (8.8%). The defendant has a college degree and the means to maintain employment and support his family.

Offenders who have never been married are most likely to recidivate (32.3.%). Even though the defendant is now divorced, the data show that those who are married are only slightly less likely to recidivate (13.8%) than are those who are divorced (19.5%).

Yet another predictor of re-offending is illicit drug use. "Overall, offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0% than those not using illicit drugs (17.4%)." *Id* pg 13. Zampanti has never had a drug problem. (*PSR*

6

*¶62)*

In reviewing Zampanti's Presentence Report, it is remarkable that he has at least five indicators that make him very unlikely to recidivate. Indicators further support the proposition that there is no need to protect the public from further crimes of the defendant, nor does he need to be incarcerated as a deterrence. The defendant is not in need of any rehabilitation or treatment. Moreover, the defendant's demonstrated remorse and disavowel of his past criminal activities combined with his manifest desire to be a good example and father to his children make him a virtual certainty to continue as a productive member of the community.

All things considered, the defendant submits that a *non-jail sentence* meets all the purposes of sentencing as mandated by 18 U.S.C. §3553(a) and provides a just punishment that fits this crime and this defendant.

Respectfully submitted,
RONALD ZAMPANTI
By His Attorney

JAMES H. BUDREAU, ESQ.
BBO# 553791
20 Park Plaza, Suite 905
Boston, MA 02112
(617) 227-3700

I, James Budreau, do certify that I served a copy of this document to AUSA Cynthia Young on this 7th day of June, 2005 by hand.

James Budreau

7